Ruffin, C. J.
 

 The lessors of the plaintiff claim to be tenants in common with the defendant, by a descent of the premises in dispute from George Pollok; and the defendant, admitting what is equivalent to an actual ouster, if the parties be tenants in common, yet insists, that the premises descended to Frances Devereux alone. The question, therefore, is, who is or are the heir or heirs of George Pollok, in respect of this land ?
 

 Here, it may be as well to say at once, that the answer to that question, and to every other that can be raised as to a descent since 1808, depends, and depends exclusively, upon the act passed in that year, and re-enacted among the Revised Statutes of 1836. That act embraces the whole subject of descents, and, consequently, repealed the law, which previously existed, whether it existed as a part ofthe common law or in the form of a Statute. It is to be seen, therefore, -how the act of 1808 applies to the case before us.
 

 The
 
 propositus
 
 deed in 1839, leaving no issue; and the present parties claim as his collateral heirs. The case may be simplified by considering that Sarah, who is represented by the lessors of the plaintiff, and was a maternal sister of Mr. Pollok, survived him: so that, upon his death, he may be supposed to have left the two sisters, Mrs. Devereux and Mrs. Burgwyn — the former of the whole blood; and the latter, of the maternal line only. The first thing to be noticed is, that the fifth and sixth sections ofthe act abrogate the incapacity of the half-blood, as such, to. inherit, which had once existed. It is thereby expressly enacted, that collateral relations of the half-blood shall inherit equally with those of the whole blood; and, also, that relations of both lines shall inherit equally in all cases, excepting only two: which are those provided for in the fourth section of the act, namely, first, where the inheritance has been transmitted to the
 
 propositus
 
 by descent from an ancestor; or, secondly, where it has been derived by gift, devise, or settlement from an ancestor, to
 
 *586
 
 whom the person thus advanced (the
 
 propositusJ
 
 would, in the event oí such ancestor’s death, have been the heir or one of the heirs. In these two cases the fourth section provides, t2ia(. tjje inheritance shall descend to the next collateral relations of the
 
 propositus,
 
 who are of the blood of the ancestor, from whom it fell or was derived. The effect of the act, therefore, may be shortly stated to be, that purchased estates —in the popular sense of the term, purchase. — descend to the nearest relations, whether of the paternal or maternal line; and that descended estates and certain purchased estates (which the act puts on the same footing with those descended) descend to the nearest relations, of the blood of the ancestor or person from whom the estate moved. Our enquiry is, then, narrowed to the point, whether George Pollok derived this inheritance by one of those peculiar purchases, §numerated in the fourth section, so as to confine the descent from him to the blood of his father, Thomas the elder, and vest the inheritance in Mrs. Devereux. This question has been argued with zeal and at much length, particularly on the part of the defendant; and the court has given an earnest and deliberate attention to every thing that was said. But, after doing so, we all think as we did on the opening of the argument, that the case is not within the fourth section of the act.
 

 Thomas Pollok, the father, owned the land in fee; and in 1777, (when the eldest son was, by law, the heir) he having two sons, Thomas and George, devised the land in fee to George, the second son; and the father died the same year, leaving both of the sons surviving him.
 

 It is to be observed, in the first place, that George did not get this land by descent. It would have been thus transmitted, notwithstanding the will, if he had been the heir of his father. But he was not then, the heir, and could only claim under the will. As, therefore, he was in by de\ ise and could not have claimed as heir to his father, had the latter died intestate, the case is neither within the words or meaning of the Legislature, as it seems to us. The act was intended to provide for every case; and there is no doubt, that it applies to ah estates, whether vested before or after the passage of
 
 *587
 
 the act. The period of the acquisition is not at ail material. But the mode of acquisition by the
 
 propositus,
 
 whether by descent or
 
 quasi
 
 descent — if the expression may be allowed— determines its quality as an estate descendible to relations a particular line, in exclusion of those of the other. Now, whether an estate be derived by descent or by purchase, is a fact, simply; and that, necessarily, is determined at the time the estate is derived. The fact, that it was derived in the one mode or the other, instantly imparted to the estate, upon its acquisition, the quality, as a descendible estate, of going, Upon the death of the new owner, to all his relations or to a particular line. We can conceive no instance, in which the character of an acquisition,whether by descent or purchasers not indelibly impressed on it at the time it is made. . Why, the very terms that must be used to state a case, prove this. For example, when it is asked, “when and how did George .Pollok get this land?” the case itself answers, that he got it in 1777, not as the heir of his father, but as a purchaser under the will of his father, which was made and went into effect in that year. Some years after the death of the father, a law was, indeed, made, which constituted all the sons heirs. But that law could not make this person, then take by descent that which he had long before taken by devise and purchase.
 
 Ballard
 
 v.
 
 Griffin, 2
 
 No. Ca. Law Rep. 258. The case before us is that of an immediate devise of the inheritance in fee; and in its application to such a case the act is . so clear, that it seems impossible to render it more so by comment. But we deem the cases of gifts and settlements equally plain. The donation of each kind, specified in the fourth section, is one, which has been derived from an ancestor, to whom the person advanced would, in the event of such ancestor’s death, have been the heir or one of the heirs. The donation is, obviously, one which is merely in anticipation of a descent; that is to say, made to a person, who would, in case the donor had not made the donation and had died intestate, have taken the same estate or an estate of inheritance in some form in the same land or some part of it. To what period are we to look to ascertain, whether the donor and donee stood in that relation to each other? We can imagine no other than that,
 
 *588
 
 at which the donation was made. Besides the general reason, that the nature of an acquisition is conclusively fixed at the . . time it first accrued, this act itself furnishes evidence that the writer had that principle in his mind, or, more probably, that unconsciously he acted on it from habit. The phrases, “
 
 has been
 
 transmitted or
 
 has been
 
 derived, ” being in the past time, necessarily refer to the period, at which the estate was acquired in one or the other of the modes mentioned. Then the words, “
 
 would have been
 
 heir, ” with the like necessity attach themselves to the same period. This construction is irresistibly confirmed by the subsequent words, “ in the event of such 'ancestor’s death.” There is merely a substitution ofu donation made at a particular day, for a descent upon the death
 
 of the
 
 donor, happening, or, rather, supposed to have happened, at the same time. In the cases of a taking by descent or devise, there must be an actual death of the ancestor. But with respect to gifts and settlements it is otherwise, and the death is merely supposed. Unquestionably it is supposed — for the purpose of determining whether the donee was heir of the donor — to have happened,
 
 instead
 
 of the execution of the instrument, which passed the estate.
 
 “ Would have been heir
 
 ” can refer to no other period; and embraces
 
 only the
 
 cases of such a donation to one, who was
 
 then
 
 an heir apparent or heir presumptive. It is the same as if the act had used the words,
 
 “
 
 would have been heir or one of the heirs,”
 
 in
 
 case, or
 
 if
 
 the ancestor had then died.
 

 It is a consequence from these positions, that we must resort to the law as it stood, or may stand, at the time of the death of an ancestor, from whom land came by descent or devise, or at the time of the supposed death of one, who gave or settled land, in order to ascertain, who
 
 was
 
 the heir, where the ancestor was dead, or who
 
 would have been
 
 the heir, if the ancestor had then died. If, for instance, a law should at this day be passed, admitting new heirs, and an estate should be derived under that law by descent or by any of the other modes mentioned in the fourth section of the act of 1808, it could not be denied that the descent of that estate from the new heir, would be regulated by the act of 1808. So,
 
 *589
 
 the various changes of the law before 1808, by which that or this person was made heir, from the common law down; must have a like effect in determining, whether an estate
 
 was
 
 derived by descent by the person last seised-, or
 
 mould have
 
 been, in case the former owner had not conveyed to the propositus, but had, at the time of such conveyance, died intestate. Thus, the act of 1808 operates upon every case alike, though the result may be different in different cases,, irom the varying states of fact in the several cases.
 

 On the other hand, it has been contended on the part of the defendant, that the person mentioned in the act as one, who “would have been heir, or one of the heirs of the donor is the heir as constituted by the act of 1808; and that the period, at which that character is to be ascertained, is the death of the
 
 -propositus.
 
 The grounds, on which these positions were founded in the argument, were, that the act of ,1808 was designed to produce one uniform and plain system of descents, instead of that previously existing, under the acts of 1784, on which many doubts had arisen; and. especially, that it was designed to preserve a man’s acquisitions to his descendants or in his family, as long as there are any, in exclusion of those not connected with him by consanguinity. It may be admitted, that those were among the objects to be effected by that statute. But it is not perceived, how those objects can impart to the act the sense imputed to it. It is true, it was intended to produce subsequent certainty in the law of descents; and to a great extent it has eminently succeeded. But the court cannot go further than the act itself has done in establishing such certainty or uniformity. The enactment here, for example, is, that an inheritance, which
 
 has
 
 descended (no matter when)
 
 shall
 
 descend to the blood of the ancestor, from whom it did descend. Now, án estate, once descended, remains always in the party as a descended estate, except only in the cases at common law of the subsequent birth of a preferable heir, as mentioned in
 
 Cutlar
 
 v.
 
 Cutlar, 2
 
 Hawks, 324, and which have no application here. When, therefore, one dies since 1808, we must, in order to know whether his estate was in fact transmitted by descent from a dormer owner, enquire whether the
 
 propositus
 
 was in law the
 
 *590
 
 heir of that former owner. It is referred to the law, existing at the time of the descent cast, to pronounce, who was heir, . *
 
 *
 
 and as such took the estate. It is an event past, and in the nature of things it cannot be altered. Nor does the act of 1808 affect to interfere with the operation of the previous law (uncertain as it was) on past cases. It declares how estates, wh ich
 
 have
 
 descended,
 
 shall
 
 descend; but it does not attempt to annul previous descents, by saying that what was a descent under the acts of ’84 should not then be so considered, nor that a person, who was not heir before 1808
 
 should, never
 
 theless, be afterwards considered to have been the heir before. The act of 1808, therefore, by making land, which had descended, one of the subjects on which it was to operate, necessarily treats all descents, which had occurred, as proper and effectual.
 

 Precisely the same principles apply in ascertaining who would have been the heir, if the ancestor had died at a particular time, that do in ascertaining who was the heir upon a death which did occur at that lime.
 

 But reliance was placed at the bar on the use of the terms; “ the heir or one of the heirs,” as denoting that the act does not apply to descents before 1784, since at common law there could be no plurality of heirs; and it was thence inferred that those after 1784 were upon the same footing. If that meaning could be imputed to those terms, yet it would,
 
 be the
 
 duty of the court to treat their introduction as a mere inaccuracy of language, subject to the control of other plain and unequivocal parts of the Statute. But, in truth, there is no inaccuracy whatsoever in the use of that language; and it is critically correct, to express what was meant, and to embrace every case of a descent at common law or under the acts of ’84 and ’95. The expression applies with propriety to two different states of the law, in one of which there could be but one heir, and in»the other there might be more. And it applies with equal propriety to cases, in which, by law, there may be a plurality of heirs, and yet, in point of fact, there is in one case but one heir, while in another there are several: The meaning in this Statute very evidently is, that if the in
 
 *591
 
 heritance was given to one, who would have been the single heir of the common law; or if it was given to one as the only existing heir under the act of’84, or as one of several existing heirs under that Statute: in either of those cases the so given shall descend from the donee to his relations of the' blood of the donor.
 

 It is true, also, that in respect to descents to the two lines,paternal and maternal, the policy of the act is perfectly ap. parent to keep the estate in that line through which it came to the
 
 propositus.
 
 Indeed, the act goes in this respect far beyond the common law, which applied this principle only to descended estates; whereas the act embraces likewise de-vises, gifts, and settlements on heirs apparent and presumptive. Yet the court cannot carry this policy further than the' Legislature itself has done, nor embrace cases which-the' words of the act, as expressed, cannot be made to
 
 cover.
 
 — > Attempts to escape from this rule of construction were made' by stating, hypothetically, cases, in which the operation of the act is supposed to be unreasonable and incongruous. — ■ For example, it was said, the Legislature could not mean to' make a difference between children, advanced at any time — - much less, between a second son advanced before ’84 and the' same son advanced afterwards. It would be presumption to' undertake to say, how the Legislature would have provided for those particular cases, if they had occurred to them. But the Legislature did not undertake to provide' for particular cases. The experience under the acts of’84 had .proved the' peril of such an attempt. This act regulates descents by general rules; and the rule, as to this point is, that estates which descend from the owner to his heir or which he give» to one who would have been an heir, shall descend to his blood. Whether the donee be a child or not, is not the criterion; but whether he be heir apparent or heir presumptive'. It is true, that if between-’84 and ’95 a father devised land to' sons and daughters, that given to the former would descend to the heir of the blood of the father; while that given to the' daughters would go to all the relations in equal degree. Why? Because the act does not say
 
 “a child
 
 advanced” but
 
 an heir
 
 advanced; and at that time sons were heirs and
 
 *592
 
 daughters were not. For a like reason it is also true, that if ’84 one settled land on a collateral heir presumptive, and afterwards married and had children and then settled other land upon a second son, or, before ’95, on a daughter, the first would descend to the blood of the settling ancestor, while the last would be a first purchase and go to all the heirs, on both sides. But, on the other hand, it is to be observed, that, upon the defendant’s construction, the land settled on the collateral, in this case, would not now descend to the line of the settling ancestor, unless indeed, we read the act as if its words, instead of being
 
 “would have leen
 
 the heir or one of the heirs in the event of such ancestor’s death,” were “to whom the person thus advanced was
 
 a relation
 
 and might by'possibility become the heir or one of the heirs:” a liberty which no court could arrogate to itself. Further, upon the defendant’s construction every settlement at this day on a collateral heir presumptive would be turned into a general purchase and go to all the heirs, if the settling .ancestor should afterwards marry and have issue, or would fluctuate between being a descended or purchased estate, with the birth and death of the issue of the settler. That certainly could not be the meaning of the Legislature; and in the case supposed, the laud given to the collateral, when he was heir presumptive, and any given to the subsequent born issue, being heir apparent, would both descend, as the. settler would wish, namely, to his blood. But we do not pursue this part of the subject further, as we have already said the statute lays down general rules to regulate descents, and that they are not to.be controlled by a supposed want of symmetry in their application to different particular cases, not specified and not intended to be specified in the act.
 

 Per Curiam,. Judgment affirmed.